AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
### Northern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.  **4-18-70503** |
| Aaron Jamal WOODS, | ) | |
| | ) | |
| | ) | **MAG** |
| | ) | |
| *Defendant(s)* | ) | |

FILED

APR 1 3 2018

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of _____ February 22, 2018 _____ in the county of _____ Alameda _____ in the
_____ Northern _____ District of _____ California _____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(o)(1) | Possession of a machine gun |

Penalties:
Max Sentence: 10 years
Supervised Release: 3 years
Fine: $250,000
Special Assessment: $100

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

APPROVED AS TO FORM:

AUSA VANESSA BAEHR-JONES

_____
*Complainant's signature*

Tyler S. Esswein, FBI Special Agent
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  4/13/18

_____
*Judge's signature*

City and state:  _____ Oakland, California _____

Hon. Kandis A. Westmore
_____
*Printed name and title*

**AFFIDAVIT OF TYLER ESSWEIN**

I, Tyler S. Esswein, after being duly sworn, depose and say as follows:

## I.   INTRODUCTION AND PURPOSE OF AFFIDAVIT

1.      This affidavit is submitted in support of a criminal complaint against Aaron Jamal WOODS (hereinafter WOODS), for possession of a machine gun in violation of Title 18 U.S.C. § 922(o)(1) (SUBJECT OFFENSE 1).  I also submit this affidavit in support of an application for warrants to search one (1) iPhone 8 cellular phone, white in color, IMEI: 356765081638874 (hereinafter SUBJECT DEVICE 1); and one (1) Motorola Moto E, Model XT1765, gold in color, IMEI: 355674086335026 (hereinafter, SUBJECT DEVICE 2), currently in the custody of FBI San Francisco.  As set forth below, I believe that SUBJECT DEVICE 1 and SUBJECT DEVICE 2 will contain evidence, including electronically stored data, of SUBJECT OFFENSE 1, as well as possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1), and possession of a machine gun in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A), (B)(ii) (collectively, the SUBJECT OFFENSES).

2.      The facts set forth in this affidavit are based on my review of written reports, my review of audio-video recorded interviews, my review of evidence items and photographs, my training and experience, and information from other law enforcement officials.  These facts are not all of the facts related to this investigation that I know.  I have set forth only those facts that I believe are sufficient to establish probable cause that WOODS committed SUBJECT OFFENSE 1, and to establish probable cause that the SUBJECT DEVICES contain evidence of the SUBJECT OFFENSES.

## II.   AGENT'S BACKGROUND

3.      I am employed by the Federal Bureau of Investigation (FBI) as a Special Agent and have been so employed since May 2017.  As a Special Agent of the FBI, I am authorized to

investigate violations of the laws of the United States, and I am a law enforcement officer with authority to execute arrest and search warrants under the authority of the United States. I have received law enforcement training throughout my employment to include graduation from the FBI Special Agent Academy. During my employment, I have participated in and have spent time talking with numerous other law enforcement officers regarding these and other investigations.

### III. FACTS ESTABLISHING PROBABLE CAUSE

#### A. Arrest of WOODS on February 22, 2018

4.      I have reviewed a report, authored by Oakland Police Department (OPD) Officer Khyber Mangal on February 22, 2018, and a subsequent supplemental report, also authored by Officer Mangal on April 2, 2018, documenting the arrest of WOODS and Terry Fammons (FAMMONS), at an address on 83rd Avenue, Oakland, California, on February 22, 2018. I have also spoken to other law enforcement officers who were present during the arrest and subsequent seizure of items of evidence and suspected contraband. Some of the details of those reports and details from my discussion with other officers present are included below.

5.      Officers from the United States Marshals Service Fugitive Task Force (hereinafter, the Task Force), were conducting surveillance at an address on 83rd Avenue, Oakland, California (hereinafter, the residence), in order to locate a wanted fugitive. Prior to conducting surveillance, officers conducted a query of the Alameda County Consolidated Records Information Management System (CRIMS) for the above address to gather more information as to who else might be residing at that residence. The CRIMS query revealed that WOODS resided at the address and was on probation out of Alameda County for a firearms-related offense with a four-way search clause for his person and for this address.[1]

6.      While conducting surveillance, the Task Force observed WOODS and an individual later identified as FAMMONS, standing on the front porch of the residence.

---

[1] For further information on WOODS' probation terms, please see *infra* Section F.

2

Approximately nine officers approached WOODS and FAMMONS in order to conduct a probation compliance check of WOODS and to conduct a security sweep of the residence in order to locate the wanted fugitive.

7.      As officers began to approach the residence, WOODS and FAMMONS were observed standing outside of a partially-opened security screen at the front door to the residence. The officers were wearing clearly marked law enforcement placards on their clothes and protective vests and immediately identified themselves to WOODS and FAMMONS as police. WOODS ran inside of the residence and closed the door behind him, while FAMMONS remained outside and complied with the officers' commands. FAMMONS was handcuffed and a pat down search of his person was conducted to locate any weapons, with negative results.

8.      Upon observing WOODS run into the residence, Agent Richard Harvey and Agent Stonie Carlson took up a perimeter position at the rear of the residence in order to prevent anyone from fleeing the residence. Officers detained FAMMONS and conducted a surround and call out of the residence. The officers continued to announce their presence as police, and issued multiple verbal commands for WOODS and any other occupants to exit the residence.

9.      After multiple verbal commands, WOODS exited the front door of the residence and was detained. WOODS was handcuffed and a full search of his person was conducted. Officer Mangal located a wallet from WOODS' right rear pocket, and approximately $2,001.50 in U.S. currency in multiple denominations from his left front pocket. Officer Mangal also observed that WOODS was breathing heavily and sweating profusely.

10.     Officers Baron Earl and Joey Guevarra, along with Agents Carlson, Brian Koh, and Harvey entered the residence to conduct a security sweep for additional occupants. Upon entering the residence, Agent Harvey and Officer Earl could smell a strong odor of unburned marijuana emanating from inside. Officer Earl and Agent Harvey observed a small table on the right side of the front room, just past the front door, on top of and around which they observed multiple bags of suspected marijuana, suspected cannabis products, suspected hashish oil, digital scales, and apparent packaging materials in plain view. Officer Earl and Agent Harvey also observed an open

3

black gun box containing loose ammunition and an extended magazine in an open drawer of the same table.

11.     Officers continued their protective sweep of the residence, but did not locate any additional occupants.

12.     Based on evidence of suspected marijuana possession and items of suspected marijuana trafficking (i.e., digital scales and packaging materials), as well as evidence of firearms possession (i.e., gun box, extended magazine, and loose ammunition), officers elected to exercise WOODS' four-way search clause and began to search the residence for further weapons, contraband, and/or evidence.

13.     Officer Earl knew WOODS to be active to probation. Officer Earl advised WOODS that the residence was to be searched per the terms of his probation. Officer Earl asked WOODS to whom the residence belonged and WOODS responded that it belonged to his mother. WOODS advised that his mother was at work and was not expected to return until later that evening. Officer Earl then advised WOODS that the officers had authority to search the entire residence and asked WOODS to tell him where the gun was located in order to expedite the search.

14.     Woods advised that the gun was in the back left bedroom under some clothes.

15.     While searching a bedroom located to the rear of the residence, in the southwest corner, Agent Carlson was advised by Officer Earl that WOODS' stated that there was a firearm in a black bag located in that bedroom. Agent Carlson located a black Jeep brand Duffel bag underneath some clothing, to the right of the bed, in pile of clothing on the floor about knee high. Upon removing the clothing on top of the bag, Agent Carlson observed a Draco assault rifle in the bag.

16.     Officer Mangal and Agent Carlson placed the black Jeep brand Duffle bag on the bed and found it to contain one Glock model 23 .40 caliber handgun and one Draco assault rifle.

4

17.     Agent Koh and Agent Harvey rendered the pistol from the black Jeep brand bag safe, observing it to be a Glock Model 23 .40 caliber handgun, black in color, and bearing serial number CFY933.  The pistol was found to contain one (1) 30-round capacity magazine, containing an unknown number of unspent .40 caliber rounds of ammunition, seated in the pistol.  One (1) unspent round of .40 caliber ammunition was also located in the chamber of the pistol.

18.     Agent Koh and Agent Harvey rendered the assault rifle from the black Jeep brand bag safe, observing it to be a 7.62 caliber assault rifle, brown and black in color, bearing serial number DR695909.  One (1) extended magazine, black in color, containing an unknown number of 7.62 caliber rounds was removed from the rifle.  One (1) unspent 7.62 caliber round of ammunition was removed from the chamber of the rifle.  Also located in the same black Jeep brand bag was one (1) drum magazine, containing an unknown number of unspent 7.62 caliber rounds.

19.     Agent Harvey located one (1) piece of mail in the name of Anthony Joseph Woods, addressed to the residence on 83rd Avenue, on a desk in the same room in which the firearms were located.  As detailed below, WOODS later told investigators that Anthony Woods is his brother, and is currently incarcerated.

20.     On top of the table located near the front door, Officer Mangal and Agent Harvey located multiple clear plastic bags containing a loose green leafy substance of suspected marijuana; four (4) black digital scales and one (1) empty digital scale box; four (4) Nice brand boxes of small sandwich bags; and one (1) white iPhone with a black charging port connected (as described further below, SUBJECT DEVICE 1).

21.     Inside of a white grocery bag on the ground next to the table, Officer Mangal and Agent Harvey located multiple clear Ziploc bags containing clear cylindrical/syringe containers containing a brown/off-brown sticky liquid substance of suspected hashish oil.  Inside of the same white grocery bag, Officer Mangal and Agent Harvey located multiple clear bags containing a green leafy substance of suspected marijuana, and one (1) edible product of suspected cannabis.

22.     From a burgundy Cookies brand backpack located on the ground next to the table,

5

Officer Mangal and Agent Harvey located a large clear bag of green leafy substance of suspected marijuana.

23.     From inside of the open drawer of the table, Officer Mangal and Agent Harvey located one (1) black Rock Island Armor gun box, bearing serial number RIA1662661. Inside of the black gun box, Officer Mangal and Agent Harvey located one (1) 31-round capacity magazine, containing an unknown number of unspent rounds of ammunition. Inside of the same box, Officer Mangal and Agent Harvey located a clear plastic bag containing an unknown number of unspent .357 caliber rounds of ammunition. Also located inside of the drawer of the table was one (1) box of federal Ammunition, containing 12 rounds of unspent 9mm Luger ammunition.

24.     Sitting on top of a couch located on the south side of the living room, Officer Mangal and Agent Harvey located one (1) gold Motorola GK40 cellular phone (as described further below, SUBJECT DEVICE 2).

25.     Based on the evidence located and recovered from within the residence, WOODS and FAMMONS were placed under arrest and transported to the OPD Criminal Investigations Division in Oakland, California.

26.     Incident to arrest, a search of FAMMONS' person was conducted and Officer Mangal located approximately $1,871.00 of U.S. currency, in multiple denominations, and identity documents--to include a California Identification card and a Bank of America Visa debit card, both in the name of FAMMONS--in a green wallet, located in his right front pants pocket.

**B. Interview of WOODS**

27.     That same day, OPD Officer Michael Jaeger and Agent Harvey interviewed WOODS at the Criminal Investigations Division of OPD. I have reviewed the recording of the interview and learned the following information.

   a.  WOODS was advised of his constitutional rights under *Miranda*, utilizing a
       standardized OPD Advice of Rights Form. WOODS acknowledged verbally that

6

he understood his rights and also initialed the form. Some of the details of that interview are summarized below.

b. WOODS indicated that he was arrested earlier in the day after a probation search was conducted and officers located two (2) firearms in his bedroom. WOODS stated that the bedroom belongs to him and that nobody else stays in that bedroom. WOODS described both firearms in detail.

c. WOODS indicated that officers found a pistol, which he identified as a Glock Model 23 .40 caliber, with a 30-round magazine and a live round in the chamber. Woods purchased this pistol off the streets, approximately five to six months prior, for approximately $1,100.

d. WOODS admitted that a sear on the rear of the Glock pistol enables the firearm to shoot in full automatic mode. WOODS advised that the sear was put on since the time that he purchased the pistol. WOODS purchased the sear from an individual in Stockton, California, whom he refused to identify further. WOODS indicated that he did not install the sear himself, but knows that it works, because he test fired it on approximately January 1, 2018. On that occasion, WOODS fired the pistol in the air on the same block where he was arrested earlier in the day. WOODS acknowledged that he knew if you engage the selector switch on the sear and press the trigger, the pistol fires on full automatic mode until you take your finger off the trigger. WOODS admitted that he picked up the spent shell casings after he test fired the pistol. WOODS advised that he only fired the pistol on that one occasion.

e. WOODS advised that he kept the pistol in a drawer near the front door. When the police came to the door, WOODS took the pistol and hid it in a back room where he kept his rifle. WOODS later stated that the bedroom where he hid the firearms belongs to his brother, Anthony Woods, who is currently incarcerated. WOODS admitted that he hid the firearms in his brother's room, believing that law enforcement would not search there. WOODS indicated that he hid the firearms underneath some clothing in the bedroom.

7

f.  WOODS advised that he has never shot at anyone with the pistol. WOODS stated that the pistol belongs to him and him only. WOODS advised that FAMMONS may have previously handled the pistol, but did not think that FAMMONS has ever fired it.

g.  WOODS described a Draco AK47-style rifle, with a wooden stock, which officers found in the residence. WOODS purchased the rifle approximately one week prior, off the streets, for approximately $1,500. WOODS advised that he has never fired the rifle. WOODS did not believe that FAMMONS has ever handled the rifle.

h.  WOODS identified a large capacity .40 caliber magazine and loose ammunition of various calibers, which were found in a drawer near the front door. WOODS indicated that these items were from previous firearms which he used to possess, but has since gotten rid of.

i.  WOODS admitted that there was approximately 1.5 pounds of marijuana at the residence at the time of his arrest, and that the marijuana belongs to him. WOODS sells marijuana from the front porch of the residence along with FAMMONS. WOODS knows that marijuana is illegal to some extent, and knows that you are not allowed to possess too much of it. WOODS admitted that he knew he was not supposed to have marijuana without a marijuana card, which he does not possess.

j.  WOODS admitted that he keeps a lot of cash, which is proceeds from the sale of marijuana, and thus has the firearms to protect him and his marijuana business. WOODS advised that FAMMONs was previously shot on the front porch of the residence by other people on the block who may have felt that WOODS and FAMMONS were trying to take over their territory. WOODS indicated that he had approximately $1,800-1,900 in currency on him at the time of arrest. WOODS advised that this money was proceeds from the sale of marijuana.

k.   WOODS reiterated that both of the firearms from the residence belong to him and nobody else.  WOODS advised that FAMMONS may have attempted to take ownership of the firearms because FAMMONS knew WOODS would be in a predicament because of the guns.

l.   WOODS identified a white iPhone, with a battery pack on the back of it (SUBJECT DEVICE 1) as his cellular phone.  WOODS provided officers with a signed Consent to Search form to view the contents of this device.  WOODS provided his mobile telephone number as 510-880-XXXX and identified the passcode.

m.  Agent Harvey used the passcode provided by WOODS to access the contents of SUBJECT DEVICE 1, and found it to be an iPhone 8, with the IMEI: 356765081638874.  Agent Harvey reviewed the photos and videos on this device, and found numerous photographs of WOODS, FAMMONS, and other, unidentified individuals.  Agent Harvey also observed photographs of what appeared to be marijuana and multiple photographs of various firearms, to include firearms Agent Harvey recognize to be an AR-15 style assault rifle, and multiple Glock brand pistols on SUBJECT DEVICE 1.

n.   WOODS admitted that he has photographs of marijuana and firearms on SUBJECT DEVICE 1.  WOODS denied that any of the photographs were of the Draco rifle or the Glock pistol located in the residence.  WOODS refused to provide any further information about the firearms photographs located on SUBJECT DEVICE 1.

## C.  Interview of FAMMONS

28.    Also on February 22, 2018, OPD Sergeant Richard Vass and Agent Harvey interviewed FAMMONS at the Criminal Investigations Division of OPD.  I have reviewed the video recording of the interview and learned the following.

a.   FAMMONS was advised of his constitutional rights under *Miranda*, utilizing a

9

standardized OPD Advice of Rights From.  FAMMONS verbally acknowledged that he understood his rights and initialed the form. Some of the details of that interview are summarized below.

b. FAMMONS provided multiple conflicting statements regarding the firearms and suspected narcotics which were found at the residence.  FAMMONS at first indicated that everything found in the residence was his.  When asked follow-up questions, however, FAMMONS provided inconsistent descriptions of the firearms, the amount of suspected marijuana, and where these items were located in the residence.  When FAMMONS was confronted about his inconsistencies, he then indicated that nothing in the residence belonged to him, but refused to identify the person to whom the items belonged.  FAMMONS later provided a statement that some of the marijuana in the residence was his, but denied ownership of anything else.

c. FAMMONS identified a gold Motorola cellular phone (SUBJECT DEVICE 2) as belonging to him.  FAMMONS provided his telephone number as 510-880-XXXX.  FAMMONS was asked if he would be willing to sign a standardized OPD Consent to Search form, to allow officers to search SUBJECT DEVICE 2 to corroborate his story.  FAMMONS advised that he did not consent to allowing officers to view the contents of his phone outside of his presence, but was willing to allow officers to view his photographs with him accessing the device and officers looking over his shoulder.

d. On SUBJECT DEVICE 2, Agent Harvey observed a video, which appeared to show an individual holding a Glock pistol, similar to the Glock Model 23 .40 caliber pistol recovered from the residence earlier that day.  FAMMONS identified himself as the person in this video and indicated that this was the same pistol located in the residence.  Agent Harvey also observed a video of what appeared to

be FAMMONS, holding a quantity of a green leafy substance, consistent with marijuana.

e.  FAMMONS was again confronted about the multiple inconsistencies in his statements.  FAMMONS admitted that he did occasionally sell marijuana. FAMMONS denied that the large amount of U.S. currency found on his person was the proceeds from the sale of marijuana.  FAMMONS admitted that he handled the Glock pistol, as evidenced in the video on SUBJECT DEVICE 2, and also admitted to having handled the Draco rifle earlier in the day.  FAMMONS concluded his statement by denying that either of the firearms belonged to him, but further refused to identify to whom they belonged.  The interview was concluded.

**D.  Review of Evidence Items from the Oakland Police Department**

29.     I have spoken with Agent Harvey, who advised that he has reviewed evidence items seized from the residence on 83rd Avenue on February 22, 2018.  Agent Harvey advised that the suspected marijuana and hashish oil is currently pending laboratory analysis.  Agent Harvey advised that the gross weight of the bulk suspected marijuana, to include original packaging material and evidentiary packaging material is approximately 1.695 pounds, or 769.84 grams. Agent Harvey further advised that this figure is specific to the bulk leafy green substance only, and not the suspected hashish oil.

30.     On February 23, 2018, the FBI took custody of the Glock Model 23 .40 caliber pistol bearing serial number CFY933 from the OPD Property Section.  Included with the pistol was one (1) 30-round capacity .40 caliber magazine containing an unknown amount of unspent .40 caliber ammunition, which was seated in the pistol; and one (1) unspent .40 caliber round of ammunition from the chamber of the pistol, at the time of seizure.  Agent Harvey examined the 30-round capacity .40 caliber magazine and found it to be loaded with 20 unspent rounds of .40 caliber ammunition.

31.     On February 26, 2018, the FBI took custody of the Draco 7.62 caliber assault rifle bearing serial number DR695909 from the OPD Property Section.  Included with the rifle was one (1) 30-round capacity banana clip containing an unknown number of unspent 7.62 caliber ammunition, which was seated in the rifle, and one (1) unspent round of 7.62 ammunition, which was located in the chamber of the rifle at the time of seizure.  Agent Harvey examined the 30-round capacity banana clip was found to contain 17 unspent rounds of 7.62 caliber ammunition.  Also included was one (1) high capacity drum magazine, containing an unknown number of unspent 7.62 caliber rounds of ammunition, which was found in the same black Jeep brand bag with the rifle and pistol.  Agent Harvey examined the drum magazine and found it to contain 68 unspent rounds of 7.62 caliber ammunition.

**E.   Test Fire of Glock Model 23 .40 Caliber Pistol on February 24, 2018**

32.     I have reviewed a report authored by Agent Harvey on February 27, 2018, along with photographs and video recordings, documenting a test fire conducted of the Glock Model 23 .40 caliber pistol.  Some of the details of that report, my review of the recordings, and my conversation with Agent Harvey are included below.

33.     On February 26, 2018, FBI Special Agent Kenneth Karch, who is the Primary Firearms Instructor (PFI) for the San Francisco Division of the FBI, and Agent Harvey test-fired the Glock model 23 .40 caliber pistol bearing serial number CFY933 at the Alameda County Sheriff's Office firing range.  Agent Harvey loaded the pistol with the original 30-round capacity .40 caliber magazine seated in the pistol at the time of seizure, containing 30 test-fire rounds of live .40 caliber ammunition.

34.     SA Karch disengaged the selector switch on the sear, which was located at the rear of the pistol, causing the pistol to operate in semi-automatic mode.  While in this mode, SA Karch was able to fire three (3) separate rounds, with three (3) separate functions of the trigger.

35.     SA Karch then engaged the selector switch on the sear, causing the pistol to operate in automatic mode.  Upon doing so, SA Karch was able to fire multiple rounds, without manual reloading, by a single function of the trigger.

### F.  Review of Superior Court Documents for WOODS

36.     As part of this investigation, I have reviewed documents from the Superior Court of California, County of Alameda for WOODS, under docket number 608747, CEN: 5325256. Included in the documents was the Clerk's Docket and Minutes, which indicate that WOODS entered a no contest plea to two (2) counts of violating California Penal Code Section 25400(a)(1)—Carrying a Concealed Firearm within a Vehicle, and that WOODS stipulated to a factual basis for the plea.  Also included, was a Superior Court of California, County of Alameda Terms and Conditions of Conditional Sentence, which was signed by WOODS on October 29, 2015.  The terms specify that WOODS is placed on Conditional Sentence for a period of 36 months, and is subject to, among other conditions, a standard four-way search condition, which states "Submit to warrantless search and seizure by any law enforcement officer at any time of the day or night, including: person, place of residence, vehicle, and any property under your control."

## IV. KNOWLEDGE, TRAINING, AND EXPERIENCE REGARDING NARCOTICS TRAFFICKING AND FIREARMS POSSESSION

37.     Based upon my training and experience, as well as conversations with other law enforcement officers, I know that persons involved in the possession and/or distribution of narcotics often employ the use of communications devices such as cellular telephones to communicate via telephone calls, text message, SMS message, MMS message, and voicemails, with their customers and/or their suppliers.  In my experience investigating criminal activity, I have learned that narcotics couriers involved in drug trafficking operations often use digital devices, including cellular telephones, computers permitting access to electronic mail and other instant messenger services, and digital storage devices to communicate with one another about, and in furtherance of, those operations.  For example, narcotics couriers often use digital devices,

13

including cellular telephones, electronic mail, instant messengers, and storage devices to communicate with narcotics suppliers to provide status updates on the narcotics couriers' locations, and to receive instructions from narcotics suppliers relating to whom and where they will meet the person receiving the contraband. Similarly, the narcotics suppliers involved in the packaging, loading, and unloading of smuggled contraband will use digital devices, including cellular telephones, computers permitting access to electronic mail and other instant messenger services, and digital storage devices to communicate with additional narcotics suppliers and narcotics couriers involved in packaging and shipping of drugs, to recruit other members to the drug trafficking operation, to coordinate travel and meetings, and for other purposes connected with the drug trafficking operation.

38.     I know that cellular telephones are often programmed for speed dialing, contain direct contact lists, and recent call activity. I know that persons involved in the possession and/or distribution of narcotics will often keep records, notes, communications, photographs, and/or videos related to their unlawful activities stored within cellular telephones.

39.     Additionally, I know that persons involved in the possession and/or distribution of narcotics often carry firearms on their person or keep them in their residence and/or vehicles in order to protect their products and the cash revenues received from the sale of these products. I know that persons involved in the possession and/or distribution of narcotics will often keep photographs and/or videos demonstrating their possession of such firearms stored within their cellular telephones. Individuals involved in the illicit purchase of firearms and firearms accessories will also frequently communicate with those supplying these items over text and through phone calls, resulting in evidence of these purchases being found on their digital devices.

## V. CONCLUSION

40.     Based on the foregoing facts, my training and experience, and consultation with other law enforcement agents, I believe WOODS, on or about February 22, 2018, in the Northern District of California, did possess a machine gun, in violation of 18 U.S.C. § 922(o). I respectfully

14

request the issuance of a criminal complaint charging WOODS with the same and a warrant for his arrest.

41.     Based on the foregoing facts, my training and experience, and consultation with other law enforcement agents, I believe that the electronically stored information contained on SUBJECT DEVICE 1 and SUBJECT DEVICE 2 is likely to contain evidence of the aforementioned SUBJECT OFFENSES, and therefore respectfully request a warrant, authorizing the search of these devices, which are currently in the custody of currently in the custody of FBI San Francisco.

DATED this __13__ day of April 2018.

Tyler S. Esswein
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this __13TH__ day of April 2018.

KANDIS A. WESTMORE
United States Magistrate Judge